This matter is Jose Hernandez V. Nunez v. Attorney General. Give Ms. Wozniak a second to get situated. Oh yes, sure thing. May it please the court, John Leschak, Leschak & Associates, on behalf of the petitioner Jose Landestoy Nunez, also known as Jose Nunez. I'm sorry, I got the name wrong. I was looking at the next case. Ms. McKinney. Yes, on behalf of Jose Landestoy Nunez, a.k.a. Jose Nunez, I would like to reserve three minutes for rebuttal. Your Honor, in this case, the Board of Immigration Appeals has committed numerous legal errors. The government claims that petitioners trying to dress up an abuse of discretion claim as a question of law. Quite to the contrary. Here, the Board is trying to dress up their legal errors as a question of discretionary decision making. The regulations... Why isn't this case more like Palmer than Fortno? If you can get it into our Fortno decision, it seems to advance your argument. Why isn't this more like Palmer? So Palmer is distinguishable because in Palmer, the I.J., the immigration judge, actually did not find that the respondent was rehabilitated. In fact, when the BIA was talking about how the I.J., rather than making a finding of rehabilitation, he said your conduct justifies denial of your application for cancellation or removal. And the only reason I'm granting you cancellation is because of the extreme equities involved with your young children. That's why they granted the cancellation application, not on the basis of a finding of rehabilitation. Where's the finding here? You can clearly infer a finding from everything the I.J. said. The I.J. was optimistic about the chances of Mr. Nunez proceeding and basically in a very productive way in society. The I.J. thought that Mr. Nunez was credible, took full responsibility. But is there a factual finding, again, without the inference from everything that the I.J. said? Because the BIA credited all that, the BIA noted all that, but they disagreed with what inferences to be drawn from those very positive factors. Yes, Your Honor. Well, the I.J. did not use the particular word rehabilitated, but it is very clear from everything that was stated in the oral decision that he did, in fact, find the respondent, now the petitioner, to be rehabilitated, especially when he credited, he said he was a completely credible witness, and he believed his testimony, and he testified that he had changed himself through his religious dedication, that he was an evangelical Christian, and through his faith in God, that he had changed himself. And the judge credited that testimony, and that is why in the final, in the closing... That was the I.J.'s opinion, and all of that leads to a conclusion that there's very little likelihood of this person reoffending. Exactly. The BIA looked at all that and said, yeah, we get all those things. We're not so sure that that leads to the conclusion that they're going to say, well, Judge, it's just a conclusion, it's a finding. I don't mean it in that sense. The BIA looked at all that and said that we don't think that necessarily means that the person has changed his life to the point that we're comfortable with in a law on cancellation of removal. Why isn't that opinion, i.e. discretion? So the BIA claimed that they were engaged in a discretionary re-weighing of the positive and negative equities in the case, but that's exactly what the BIA claimed the same thing in the Guzman v. Holder case from the Second Circuit, which we cited. That was the sodomy case where the immigrant had been charged with sodomy but had not been convicted, and in trial before the IJ, they claimed they were innocent. The IJ made no factual finding that the immigrant had committed the sodomy offense, but then he was granted cancellation in Guzman, and then the DHS appealed to the BIA, arguing that the IJ abused his discretion by granting cancellation. BIA says, yes, this sodomy offense was very serious, and we also don't think he's shown sufficient rehabilitation to merit this as an exercise of discretion. It goes before the Second Circuit. Second Circuit says, BIA, you claim that this decision, this reversal of the IJ, was just a result of your discretionary re-weighing of the positive and negative equities, but in fact, you engaged in appellate fact-finding by determining that essentially you determined that this immigrant committed the sodomy offense, even though he had never been convicted, never admitted that, and the IJ made no factual finding as to that. There's a reason. The regulations prohibit the board from engaging in appellate fact-finding, and, Your Honors, there's a reason for that. It's because nothing can take the place of actually seeing the alien and witnesses up close and observing them in person, the facial expressions, the nuances of what they are communicating, and after all, Your Honors, isn't that also what underlies the whole idea of having oral argument? So that's the panel. I thought this one, as long as we're talking about Second Circuit cases, is actually closer to Noble, where the IJ made a finding that I think was clearer than the one here. The IJ in that case said, in light of the foregoing analysis, the court concludes that Noble has finally demonstrated good efforts at rehabilitation. Nevertheless, the Second Circuit said, yeah, but the BIA was just rebalancing the equities. They weren't overturning that factual finding. Can you talk about Noble for a little bit? Absolutely. I think our argument is that Noble is also distinguishable because in Noble, the BIA did what it was supposed to do, which was that it looked at rehabilitation, it accepted the factual finding of rehabilitation, and then weighed that against the other negative factors in the case. That's what the board should have done in this case. That's what the board claimed it did in this case, but it's not what the board actually did. And the truth is shown by the language that the board used. It's very particular. I draw the court's attention to the very particular language the board said. In this case, they said, we are not persuaded by this. In Noble, they said, we doubt the authenticity of the petition's rehabilitation. How is it really different? Well, looking at the Second Circuit decision, Your Honor, they did say that they weighed, they were doubting the authenticity of the rehabilitation evidence. Also, if you look at the particular facts of the Noble case, the respondent, the alien, had continued to commit offenses even up until shortly before the date of trial. I think also Noble could be limited to the very particular set of facts of an alien who had just the recidivism. It just keeps going out and committing these same offenses even after he's been put into removal proceedings. I actually agree with you that the language from our, in our case, the BIA's decision that you were about to quote or started quoting is the most troublesome part that makes this a close case. But when I look at, back to where Judge McKee started, when I look at the immigration judge's opinion, the structure of the opinion begins with findings of fact. And there's like three, three and a half pages of findings of fact. And nowhere in there does he say, I find rehabilitation. And then he, and then he switches from those factual findings to his, what he calls his discretionary analysis. This is beginning at the bottom of page five and over onto pages six and seven. And that's where, in the discretionary analysis, he talks, there's all this good language suggesting the possibility of rehabilitation. I guess I'm back to where Judge McKee started. Where do we find the actual finding of rehabilitation, the factual finding of rehabilitation? So again, may it please the court, the IJ never used the particular word rehabilitated. However, I think that you could reasonably infer that he found the petitioner to have been rehabilitated, especially at the very end where he said the court is optimistic and believes that Mr. Landestoy is going to make positive contributions to society. And therefore, we grant him cancellation. Isn't that, it's clearly the IJ's opinion. I mean, I'm wrestling because I think this is a really close and difficult case. I think you'd agree that two or more people can look at the exact same set of circumstances, even facts, and draw a different conclusion from those facts. Is the conclusion that is drawn, one, is it a factual conclusion or is it a belief? How you weigh those various things, whether you look at one picture and say, I deduce the following from a picture. Someone else looks at the picture and says, no, that person's wrong. I deduce something else. It just seems to shade the difference between a factual distinction and a discretionary distinction. And I'm not sure, and maybe it's almost metaphysics we're getting into. I'm not sure that that is fact. I'm also not sure that it's discretion. I just don't know. But it's difficult. And I'll ask your colleague about something that the BIA said in its opinion that troubles me, because it seems that they impose an impossible burden on Mr. Nunez. They asked him to demonstrate something that no one could demonstrate. But I'm not sure if that's enough for us to do anything under the law. So it's very interesting. The court brings up the question of metaphysics. It reminds me of the painting by the French surrealist artist René Magritte with the pipe, the smoking pipe. And it says, is this a pipe? That's the name of the painting. Is this a pipe? And the answer is no. It is not a pipe. It is a painting of a pipe. So he's bringing up that there can be a distinction between the actual thing and its objective reality and the representation or the understanding of the thing. Metaphysics. So the painting. So but when it comes, there are certain things where there's an overlap between those two things. For example, rehabilitation is rehabilitate. Rehabilitation kind of melds into belief. And I couldn't I don't think it's certain things cannot be separated from the belief themselves. When especially with rehabilitation, with dealing with things such as, for example, drug addiction or other types of addiction. When when is a person rehabilitated? You know, for a person who deals with addiction, they have to struggle with that every single day. And it's a it's a mental state. And it also requires a certain level of belief and a belief in that person. So I think that when it comes to the fact that there's two different counselors involved, that person could know anything used to know about the person and conclude differently. One person would say this person is rehabilitated. Very low likelihood of reoffending. Another counselor could look at the person and say, this person's likelihood of reoffending is 50-50. And there's no there's no hard and fast way of determining who's right, who's wrong. Even if what they're expressing is a factual conclusion as opposed to an opinion, which in this context seems to shade into discretion in terms of whether or not you're going to trust the person. How much do you trust this person? After that day, the I.J. trusted the person not to be offended. The I.A. didn't. They weren't convinced. But again, I'm not actually talking about this. As I said, I think they put an impossible burden on them. And that's the way that leaves us under the law. I'm just not so sure that this is a fact versus discretion. Frankly, I don't know the difference anymore. After thinking about this an awful lot. I'm not sure my time is up, so I'm not sure if the court wants me to respond. Well, I'm just sharing my thoughts with you. You've got some time rebuttal. Maybe you can help me. Yes, I'll raise that. Thank you. May it please the court. My name is Catherine McKinney and I represent the United States Attorney General in this matter. This court should dismiss the petition for review for lack of jurisdiction. It's uncontested that petitioner is removable due to a controlled substance offense. So the criminal alien review bar applies. Additionally, the agency denied relief as a matter of discretion. So the discretionary determination review bar applies. Yes, your discretion. I'm not sure this goes to the discretionary question, but it's what I suggested to your friend over there. Mr. Lashak was troubled by. The BIA said in overruling the IJ's findings, slash ruling, whatever it was. The BIA took into account all the very positive things that the IJ had found about him. They were positive things. And it then said that the adverse factors of his serious and extensive criminal history, given them, it is our judgment that discretion cannot be exercised in his favor absent powerful evidence that he has no propensity to re-offend. This record does not contain such evidence. How could one come up with that? Given what he put in the record, the BIA said, well, that's not powerful evidence that he has no propensity to re-offend. What troubles me is no propensity to re-offend. There's, I'm not sure I'm familiar with it. There's a study by Professor Carnegie Mellon called Redemption where he looked at, he looked at people convicted of very serious felonies that had been released, and he tried to find out whether or not persons who have a criminal history are ever safe enough at risk for a harassment. This came out of an employment discrimination case. He concluded that there comes a point in time, in the average, at which a person is no more statistically likely to re-offend than someone with no criminal record. And the person at issue there was somebody convicted of manslaughter. And he drew that line at 10 years. And he said there's no statistical difference. But he also said that in any individual case, the likelihood of a person re-offending would never be the same as someone who has never been in the criminal justice system, although statistically there's no distinction. If given that research, and it's the only study out there I know of its kind, for the BIA to say that he has not suggested, he has not come forward with powerful evidence that he has no propensity to re-offend, how could he have proven that? How could he have proven negative? How can he show? A priest, and we all know this from the 2010 report. If you get somebody who comes in here as a cardinal, that person couldn't show they have no propensity to offend. Well, my response to that is twofold with respect to the evidence of the study that Your Honor was citing. I want your answer. But it may well be that what I'm getting at is still discretion. I don't know. But that's what troubles me. And that's, listening to what Your Honor had to say about the study and evidence of rehabilitation, I think that would lend itself even more towards the argument that this is evidence going towards rehabilitation that's evaluated as a matter of discretion and not a bar or a ticket, a box that you meet. Then, boom, you've established rehabilitation. But it's evidence going towards rehabilitation that the agency is considering when they are conducting their discretionary analysis. But don't they have to give them a fair opportunity to make that showing? And here, I think what they were saying was, as we're weighing the positive and negative factors, and if we look at the context in which this arises, the agency has to weigh the positive and negative factors in determining whether or not to exercise discretion. And in their published decisions in the matter of Marin, which is a 212C case, there it was listed out the factors that have been deemed relevant to those considerations. And then in the subsequent published decision of CBT, the board has said those factors are also relevant to our discretionary analysis in the cancellation context. But it's clear in both of those published cases, when they talk about, if in a particular case a criminal record is present, normally evidence of genuine rehabilitation would need to be submitted to be balanced. But they're clear in both those cases that it's still a case-by-case determination. It's not a burden of proof eligibility issue, but a matter of the type of evidence that the agency is looking for as they balance discretion. What is the kind of evidence? How could he prove it? Given what the BIA is expecting of him, how in the world could he possibly prove that he's turned his life around? I do not believe that what the agency is saying, that the individual, again, would have to present evidence that he had no propensity to reoffend. They said, absent powerful, not just evidence, powerful evidence that he has no propensity to reoffend. And I would submit the reference to that. That's the type of evidence they were looking for, more powerful evidence going towards rehabilitation than was present in this case. Give me an example. Like what? He rushed into a burning building and rescued 12 children in his own peril. What are they looking for? Well, considering that it's a scale and it's a balancing equities, in this case where we have such serious criminal history, which they agreed with the immigration judge in that case, the criminal history was numerous. It was recent. It was serious. They adopted the immigration judge's findings in that respect. They also adopted the immigration judge's findings that the circumstances of the crime were very worrisome and troubling. In this case, we have an individual who was convicted of selling drugs on the street in possession of an illegal defaced firearm. Involved in the burglary of a home in which a juvenile had been used. That would make the scale here, so we would need more evidence here than what was presented. What is that evidence? More evidence than what was presented here. Years ago, I met with a group of lifers. One of them made a statement to me. He basically said, 30 years ago when the court put me in prison for committing three murders, I did the right thing. I belonged to be in prison. The person you're talking to right now is not the same guy. And he may have been telling me the truth, may not have been telling me the truth, who knows. But what I'm trying to get at is people do change. The IJ thought that Mr. Nunez had changed. Mr. Nunez produced evidence to try to suggest they changed. The IJ bought it. The BIA didn't buy it. But in rejecting it, and I want to repeat myself while I'm doing it, the BIA seemed to have erected a hurdle that is so high that no one could meet it or no one could expect what they have to show to meet it. And I'm wondering whether or not that is something we can be cognizant of. If the BIA is erecting such a high standard that it's impossible to meet it, is that something that a court can be cognizant of? I'm not saying that that's true in this case. Another way of asking it might be, in this case, the evidence of rehabilitation, much of it was, you might say, subjective. He said he's remorseful. He said he has had a religious experience and so on. Those are subjective, and they're hard to evaluate. So are they looking for more objective evidence of rehabilitation? I can just look at the other cases that we have before the court, the unpublished cases from this circuit and the published cases from your sister circuits, and it appears that the evidence that the agency had considered in those cases were similar to here, expressions of remorse, but also other contributions to society. We have here the immigration judge recognizing the expressions of remorse and regret, which the board did not dispute, and also indicating that there wasn't really a great deal in the record in terms of contributions to society, at least as a non-inmate. So that there might have opened the door. But again, I think that that goes more towards the fact that this is a weighing of the evidence. And just one point on that matter, I don't view this as a hurdle, more as a scale. Like not as a hurdle you have to overcome, but as a weighing of the evidence. When you have a serious criminal history and the circumstances are serious, how much evidence did they need to tip the scale? And for the judge it went one way, and the board it went the other way, but that just reflects the fact that it's a weighing of the evidence and a discretionary determination. And the government would urge the court to follow the decisions of the sister circuits that addressed analogous circumstances in Noble. The government does feel that this case is very closely similar to Noble and Wallace, and in those cases the board overturned the immigration judge's grants of cancellation of removal, and in that case noting that the evidence wasn't adequate towards rehabilitation in those cases. So that's similar to this case? It's hypothetical, and I'm not trying to pin you down here. I really am trying to wrestle with this thing and see what's the person to do here. What if rather than Mr. Nunez making the representations about how he turned his life around, he got involved in his religious community, what if his priest or his pastor or his rabbi or someone come in and say, I've seen this person in the church community, I've seen the way he interacts with parishioners, and this is a different guy. This guy is someone who I would trust with my home. In fact, he's living with me now. Would that be enough to substantiate the person's becoming, whatever you want to use the word, reformed, whatever? And I'm not sure the answer to our legal question is whether or not this is a discretionary review or not, but would that be enough? And, again, it's hypothetical, so I don't know. I can just compare it to the facts of the other cases, and, again, it's the type of evidence that the agency would consider in administrative proceedings, and I'm not aware, given the board's published decisions in Morin and CVT, that that seems to indicate that it's a case-by-case, discretionary analysis. In the case, you're doing a wonderful job of dancing around the question. I don't blame you. I do the same thing if I were in your shoes. But is that enough in this case? I think in this case we had expressions of remorse and regret, and we did have family members and community members testify that they believed that the applicant had changed his life around, but it wasn't enough for the board, and it's the government's position that that's within. Would that be enough? I do believe, actually, there was an affidavit and testimony from a pastor presented in this case, and the board has said that it wasn't enough. Could I ask you about the same language that troubles me that, again, I think makes this a closed case? The IA said, but we're not persuaded that this 11th hour declaration supports a finding of genuine rehabilitation. That sounds an awful lot like fact-finding, doesn't it? It's actually in the context that it was presented was what the board was tasked with doing, which was deciding whether or not the discretionary grant was appropriate, and it's in that context, and that's the language the Second Circuit uses in Wallace, which was actually a less strong case than this case, because in Wallace I believe the immigration judge actually had found genuine rehabilitation, and the board disagreed and said it was not adequate evidence of rehabilitation, and the Second Circuit in that case still declined to exert jurisdiction, found that that presented a challenge to the agency's discretionary determination, and additionally that it did not present a question of impermissible fact-finding. When the board looks at the facts of the case and weighs the facts of the case, that's not the same thing as fact-finding, or at least that's what the Second Circuit concluded, and we would urge the court to conclude similarly in this case. And then just to get back to the question that you asked my co-counsel here, I do believe that this is a little bit of a straw man argument where the immigration judge in this case didn't actually find, unlike, for example, in Wallace where the immigration judge had found rehabilitation. It sounds like the BIA interpreted what the IJ concluded as a finding. I think the BIA recognized the expressions of remorse, the same that the immigration judge did, and expressions of intent and allocated that where it did. It was evidence towards rehabilitation, but didn't find it enough. Again, in the exercise of their discretion. What about the language you just read by my colleague that said the BIA said that wasn't enough to support a finding of rehabilitation? If the BIA thought what the IJ did was a finding, isn't that sufficient? They can't do that? No, and again, the context here was discretionary, and they may have used that language, but if we look at what they're tasked to do, they are not actually required to find rehabilitation or lack thereof. Evidence going towards rehabilitation is one thing that has been deemed a relevant factor in their discretionary determination, but unlike other areas, perhaps a burden of proof issue in the CAT context, this isn't something that the agency was required to find or not find. It was evidence they were required to weigh, and given all indications they did, they just merely disagreed with where the scales tipped in this case. So we would urge the court to find that this was not impermissible fact-finding. The agency, the board, stated the correct standard. It applied the correct standard. We see the board referring back numerous times to the immigration judge's facts, here some of which indicate a very serious criminal history, and we would urge the court to find, similarly to the Second Circuit did in Wallace and Noble, that this is not impermissible fact-finding and decline to exert jurisdiction in this case and affirm the decision of the agency. Thank you. Thank you. We have time, I believe. Do we have time? We have three minutes. That's right. We have three minutes. Okay, thanks. Yes, may it please the court. Counsel discussed CBT and matter of Marin, both requiring evidence of genuine rehabilitation, and the board in this case found that the record contained no evidence of genuine rehabilitation. This is clearly not the case. The petitioner submitted a lot of evidence. I just want to note that we have today with us in the courtroom, in the back row, we have respondents, the petitioner's mother, father, brother, sister, as well as his pastor, Pastor Jarvis, who testified before the immigration judge. He did testify. He did, and Pastor Jarvis is here with us this morning, as well as numerous members of the petitioner's religious congregation are also here. They came out to support him. That by itself says something. That by itself is evidence. Did the board find that there was no evidence, as you said, or just there wasn't powerful enough evidence? The BIA, Your Honor. The BIA, in their decision, to look at the exact language, the exact language is, it is our judgment that discretion cannot be exercised in his favor, absent powerful evidence that he has no propensity to reoffend. This record does not contain such evidence. In other words, they found no evidence that he has no propensity. But no powerful evidence. That's what I was asking McKinney about, was that same note. Well, we argue that there is powerful evidence that he has no propensity to reoffend. And the judge particularly was very impressed by the testimony of Pastor Jarvis, who he's not, he's a bishop, and he came and he testified on behalf of Mr. Landestoy. And the judge said, this man, this pastor, came and he laid his reputation down on the line for this man. That's in the IJ's? That's in the IJ's oral decision. He said this pastor has laid his reputation in the community on the line for Mr. Landestoy. That is powerful. And I maintain that Mr. Landestoy has presented powerful evidence and the BIA ignored it because the BIA didn't want to see it. This is appellate fact finding. This is not discretionary reweighing of evidence. The judge was very clear. The judge, for instance, said, I am optimistic and I believe Mr. Landestoy will make positive contributions to his community if we allow him to be released. And although he didn't use the word rehabilitated, that statement is very clear what he believed. The difference between a belief and a fact. Now, if the judge believes it's a fact, it's essentially a fact. Our system allows, our system says the judges make the fact finding, not the BIA. Thank you. Thank you. Mr. Leszek, I just want to thank you. We very rarely see, this has been my experience, we rarely see, I guess you're retained counsel, not pro bono counsel. I am retained counsel. But we rarely see really good legal representation, unfortunately, in immigration cases. And there's a lot that's been written about that. But it's very difficult for people in immigration posture or removal proceedings to find good counsel. You've been, not saying that you're right or that we agree with you, because we haven't talked about the case. You may well lose, despite the fact you're very good. But I want to thank you for the manner in which you represented Mr. Nunez. We don't often see that. And, Mr. King, I want to thank you for your candor and for tolerating my kind of mental wanderings, wherever we're going. It's a very, very difficult case, very interesting case, very, very difficult case. Thank you both. Thank you. We'll take about a five-minute break, and then we'll take the last case.